IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| E3 BIOFUELS, LLC,<br><br>          Plaintiff,<br><br>  vs.<br><br>BIOTHANE, LLC, successor in interest and liability to BIOTHANE CORPORATION; and PERENNIAL ENERGY, INC.,<br><br>          Defendants. | CASE NO. 8:11CV44<br><br>MEMORANDUM<br>AND ORDER |

This matter is before the Court on the Joint Motion for Summary Judgment (Filing No. 381) filed by Defendants Biothane, LLC ("Biothane") and Perennial Energy Co. ("PEI") (collectively "Defendants"). For the reasons discussed below, the Motion will be granted.

## BACKGROUND

The following facts are those stated in the briefs and supported by pinpoint citations to evidence in the record, those the parties have admitted, and those the parties have not properly resisted as required NECivR 56.1 and Federal Rule of Civil Procedure 56.

This case arose out of an attempt by E3 Biofuels-Mead, LLC, f/k/a Nebraska BioClean-Mead, LLC ("Bio-Mead"), to "develop, finance, construct, and operate a commercial demonstration of patented technology, which integrates a modified ethanol unit with a co-located cattle feedlot and proportionately sized anaerobic digestion system." (Nebraska Attorney General Opinion Letter dated Oct. 6, 2003, Filing No. 382-1 at ECF 1.) Plaintiff E3 BioFuels, LLC ("E3"), brought the action in its capacity as the

assignee and holder of claims pursuant to an assignment from bankruptcy debtors Bio-Mead and Bio-Mead's holding company.

E3 alleges that Bio-Mead contracted for the construction of an ethanol plant located in Mead, Nebraska (the "Plant"), that would retrieve usable energy from cattle waste to help produce ethanol and other products. Specifically, E3 alleges that Bio-Mead entered into a purchase order contract with Biothane on or about July 18, 2005, whereby Biothane agreed to supply a boiler system to the Plant in consideration for $1,450,000, plus sales tax (the "Purchase Order Contract"). E3 contends that Bio-Mead and its holding company sought bankruptcy protection on November 30, 2007, due to the Defendants' failure to fabricate, install, integrate, program, test, commission, and start up a fully functional boiler system (the "Boiler System") for the Plant.

Under the Purchase Order Contract, Biothane was allowed to subcontract some or all of the work, but it remained responsible for any work subcontracted. Biothane also was required to supply Bio-Mead with certain products. The Purchase Order Contract stated:

> Biothane will supply, start-up, and warrant the boiler system and controls as well as manage and take responsibility for integration of the boiler into the biogas handling system for a lump sum price of $1,450,000. This lump sum price includes the boiler system equipment described above, the freight to the jobsite for the boiler equipment subject to the assumptions above, the design engineering services necessary to integrate the boiler into the overall biogas management system, and markup including contingencies. Biothane stands behind the integrated performance of the biogas handling system including the proper functioning of the boiler equipment.

(Filing No. 60-1, Purchase Order Contract Attachment B, at ECF 8.)

When the Purchase Order Contract was executed, Biothane was an engineering company, representing that it specialized in anaerobic digestion technology (conversion of biodegradable materials into biogas) and system integration, including the integration of boiler systems and gas systems. Biothane's staff included engineers such as John Murphy, a mechanical engineer, and Graig Rosenberger, a chemical and environmental engineer. E3 contends that Biothane and its engineers were responsible for the manufacture, fabrication, supply, installation, integration, programming, testing, start-up and commissioning of the entire Boiler System, including two boilers known as boilers B-601 and B-602.

E3 alleges that PEI entered into a subcontract with Biothane through which PEI, along with Biothane, was responsible for providing services for the installation, testing, commissioning and start-up of the Boiler System, but Biothane retained responsibility for PEI's work within the scope of the Purchase Order Contract.

PEI was at all relevant times an engineering company that specialized in biogas-processing and waste-gas burner systems and controls. It designed and manufactured biogas processing systems, working on 20 to 30 projects each year. With respect to the Purchase Order Contract, PEI provided specialized engineering services and its staff included engineers, such as Ted Landers, Larry Connor, and Brad Alexander. For example, Landers, PEI's Vice President of Engineering, had two engineering degrees and over 30 years' experience designing and building specialized biogas handling equipment.

Attachment B to the Purchase Order Contract (Filing No. 60-1 at ECF 8) referred to engineering services and expertise to be provided by Biothane:

> Engineering, submittals, engineering documentation and O & M Manuals are included in the individual scope . . . .
>
> Biothane stands behind the integrated performance of the biogas handling system including the proper functioning of the boiler equipment.

Biothane's subcontract with PEI (Filing No. 383-11 at ECF 2) stated:

> It is understood that PEI will design, supply, start-up and warrant the boiler system and controls as well as be responsible for the integrated performance of the compressor, flare and boilers with the digester gas supply so as to optimize the performance of these systems to result in the maximum utilization of the biogas generated by the digesters up to the capacity of the boilers.

E3 alleges that on or about February 9, 2007, PEI was in the process of the initial installation and testing of the Boiler System, led by PEI's Project Manager, Landers. When boiler B-602 would not fire, PEI personnel by-passed certain control processes, causing a major explosion in boiler B-602, rendering it inoperable and preventing substantial completion of the Boiler System and Ethanol Plant.

E3 presents theories of recovery against Biothane based on breach of contract, negligence, gross negligence, respondeat superior, and negligent misrepresentation. E3 also presents theories of recovery against PEI for negligence and gross negligence. In sum, however, E3 alleges that the explosion in Boiler B-602 on February 9, 2007, was caused by the negligence of PEI employee Landers, and that Bio-Mead suffered substantial damages as a result.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law." *Gage v. HSM Elec. Prot. Servs., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)). The court will view "all facts in the light most favorable to the nonmoving party and mak[e] all reasonable inferences in [that party's] favor." *Schmidt v. Des Moines Pub. Sch.,* 655 F.3d 811, 819 (8th Cir 2011). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.) (quoting *Matsushita*, 475 U.S. at 586-87)), *cert. denied*, 132 S. Ct. 513 (2011). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment.

5

*Quinn v. St. Louis County.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"– where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

**I.     Subject Matter Jurisdiction**

E3 is a limited liability company organized in the State of Delaware and with its principal place of business in Kansas. (Am. Compl., Filing No. 60 at ¶ 1.)  E3's sole member is an LLC with two members, an individual who is a citizen of South Dakota, and a Kansas corporation with its principal place of business in South Dakota. (Supp. Corp. Disclosure Statement, Filing No. 451 at 2.)  Defendant Biothane is a limited liability company organized under the laws of Delaware, with its principal place of business in New Jersey. (Biothane's Answer to Pl.'s First Am. Compl., Filing No. 76 ¶ 2.)  Its sole member is a Delaware corporation with its principal place of business in Pennsylvania. (Corp. Disclosure Statement, Filing No. 77 at 2.)  PEI is a corporation organized under the laws of Missouri with its principal place of business in Missouri. (Am. Compl., Filing No. 60 at ¶ 4.)

A corporation is a citizen of the state of its incorporation and the state of its principal place of business. *GMAC Commercial Credit LLC v. Dillard Department Stores, Inc.*, 357 F.3d 827, 828 (8th Cir. 2004). An LLC is a citizen of every state of which one of its members is a citizen, but is not a citizen of its state of organization unless a member of the LLC is a citizen of that state. *Id.* at 829; *Onepoint Solutions, LLC v. Borchert*, 486 F.3d 342, 347 n.4 (8th Cir. 2007). Accordingly, there is complete diversity between the E3 and the Defendants.

Defendants argue that this Court lacks subject matter jurisdiction over E3's claims because E3 impermissibly manufactured diversity jurisdiction by taking an assignment of claims from a non-diverse affiliate. "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359.

"An absolute, non-collusive assignment to a diverse assignee creates diversity jurisdiction." *Slater v. Republic-Vanguard Ins. Co.*, 650 F.3d 1132, 1135 (8th Cir. 2011) (citing *See Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823, 828 n. 9 (1969)). Due to the "increased possibility of collusion between related entities . . . assignments between parent companies and their subsidiaries must be treated as presumptively ineffective." *Airlines Reporting Corp. v. S & N Travel, Inc.,* 58 F.3d 857, 862 (2d Cir. 1995). To rebut this presumption, the party invoking jurisdiction must "articulate a legitimate business purpose for the assignment," *Airlines Reporting, id.* at 863, and bears a "heavy burden of proof." *Prudential Oil Corp. v. Phillips Petroleum Corp.,* 546 F.2d 469, 476 (2d Cir.1976).

E3 has met its burden. On November 17, 2010, the claims contemplated by this lawsuit were assigned to E3 by the Honorable Robert D. Berger, United States Bankruptcy Judge for the District of Kansas, Kansas City Division. *See In Re: E3 Biofuels-Mead, LLC*, Debtor, Case No. 07-22733-RDB, Filing 753 ¶ 18. The assignment was requested in a motion filed by the Bankruptcy Trustee. *Id.* There is no indication that the Bankruptcy Judge's assignment was the result of collusion intended to manufacture diversity jurisdiction. The Court is satisfied that complete diversity exists and the Court has subject matter jurisdiction.

## II.   Statute of Limitations

Defendants also contend that E3's negligence claims are barred by the applicable statute of limitations. Specifically, Defendants argue that E3's claims arose out of a professional relationship between the parties, and the two-year statute of limitations for professional negligence is set forth in Nebraska Revised Statute § 25-222.[1] E3 argues that its claims are subject to the four-year general statute of limitations for negligence actions, set forth in Neb. Rev. Stat. § 25-207.

The Nebraska Supreme Court has held that § 25–222, enacted in 1972, is a special statute of limitations for professional negligence. *Swassing v. Baum*, 240 N.W.2d 24, 28 (Neb. 1976). "A special statute of limitations controls and takes precedence over a general statute of limitations because the special statute is a specific expression of legislative will concerning a particular subject." *Reinke Mfg. Co., Inc. v.*

---

[1] Nebraska law governs the statute of limitations issue. *See Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 437 (2010) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)) (internal quotation marks omitted) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."); *see also* Purchase Order Contract, Filing No. 60-1 at ¶ 30.0, "GOVERNING LAW."

8

*Hayes*, 590 N.W.2d 380, 387 (Neb. 1999) (quoting *Kratochvil v. Motor Club Ins. Assn.*, 588 N.W.2d 565, 573 (Neb. 1999)) (internal quotation marks omitted). In *Swassing*, the Nebraska Supreme Court said "we do not believe that the Legislature in adopting the special statute of limitations for professional negligence, section 25–222, . . . intended that the various aspects of the whole professional relationship should be separated . . . ." 240 N.W.2d at 28. Accordingly, if E3's claims "arise from its professional relationship with [Defendants], then § 25–222 is the applicable statute of limitations" and no other limitations period applies. *See Reinke Mfg. Co.*, 590 N.W.2d at 387.

### A. Engineers As Professionals

To determine whether the statute of limitations for professional negligence applies, the Court first must determine whether the Defendants, as engineering companies, are "professionals" for the purposes of the statute.

"A professional act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." *Witherspoon v. Sides Constr. Co.*, 362 N.W.2d 35, 42 (Neb. 1985). Using this guideline, the Nebraska Supreme Court has determined that engineers are professionals for purposes of § 25-222. *See Reinke*, 590 N.W.2d at 388; *Bd. of Regents of Univ. of Nebraska v. Wilscam Mullins Birge, Inc.*, 433 N.W.2d 478, 483 (Neb. 1988); *Williams v. Kingery Constr. Co.*, 404 N.W.2d 32, 34 (Neb. 1987); *Witherspoon*, 362 N.W.2d at 42.

E3 argues that Defendants are not professionals because there is no evidence that they were licensed as engineers at the time E3's claims arose. As a general matter, in determining whether someone is a "professional" within the meaning of § 25-222,

courts look to whether the profession entails "specialized knowledge requiring long and intensive preparation to practice one's chosen occupation traditionally associated only with professionals." *Parks v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 684 N.W.2d 543, 550 (Neb. 2004). The Nebraska Supreme Court has said that "a college degree embodies such characteristics and that licensing, *although not dispositive*, strongly indicates that an occupation is a profession." *Id.* at 550-51 (citing *Jorgensen v. State Nat. Bank & Trust,* 583 N.W.2d 331, 335 (Neb. 1998)) (emphasis added).

E3 argues that, in spite of this language, licensing is dispositive of whether Defendants are professionals, because Neb. Rev. Stat. § 81-3402 required architects and engineers to obtain a board-issued license. E3 argues that it would be illogical to for Defendants to be afforded the protection of § 25-222's two-year statute of limitations when the Defendants have presented no evidence of licensure. The Nebraska Supreme Court has said, however, that "a profession is far more than the mere possession of a license to ply one's trade." *Tylle v. Zoucha*, 412 N.W.2d 438, 440 (Neb. 1987). The Nebraska Supreme Court has adopted the following definition of "profession":

> . . . a calling requiring specialized knowledge and often long and intensive preparation including instruction in skills and methods as well as in the scientific, historical, or scholarly principles underlying such skills and methods, maintaining by force of organization or concerted opinion high standards of achievement and conduct, and committing its members to continued study and to a kind of work which has for its prime purpose the rendering of a public service. . . .

*Id.* This definition "stresses the long and intensive program of preparation to practice one's chosen occupation traditionally associated only with professions. . . . This definition also does not rely on the mere possession of a license." *Id.* at 441. Applying this definition, the Nebraska Supreme Court has held that engineers are professionals

10

for purposes of § 25-222. Regardless of whether the Defendants held licenses at the time their services were rendered, the undisputed evidence demonstrates that they were providing services as engineers. Defendants, therefore, were professionals within the meaning of the statute.

### B. Acting in a Professional Capacity

The Court next must determine whether E3's claims arose out of its professional relationship with Defendants. Specifically, the Court must find whether Defendants were "acting in a professional capacity in rendering the services upon which the claim is based." *Parks*, 684 N.W.2d at 549. "In determining whether a particular act or service is professional in nature, we must look to the nature of the act or service itself and the circumstances under which it was performed." *Id.*

In *Williams*, the plaintiff sued an architectural firm and general contractor for injuries he received when he fell 30 feet due to the absence of a wall that should have been constructed. 404 N.W. 2d at 33. Having determined that architects and engineers were "professionals" for purposes of § 25-222, the court looked to whether the architect's failure to detect the absence of the wall was professional conduct. *Williams*, 404 N.W. 2d at 34. The court concluded that the architect "had a professional responsibility to supervise the construction and see to it that all walls called for by the plans and specifications were in fact constructed." *Id*. For this reason, "[i]t was not the failure to find the wall missing which constitute[d] the act of negligence but, rather, the failure to properly supervise and see that the required wall was constructed which [gave] rise to the cause of action." *Id.*

In *Wilscam Mullins Birge*, the plaintiffs alleged that the defendants were negligent in designing shop drawings for concrete floor slabs, overseeing the installation and construction of the slabs, and providing bad advice when attempting to correct the problems with the slabs. 433 N.W.2d at 479-83. The court recognized that, "A professional act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." *Id.* at 483 (quoting *Witherspoon*, 362 N.W.2d at 42). The court also noted that, in Nebraska, engineers and architects are professionals within the scope of § 25-222. *Id.* Based on these criteria, the court determined that the allegations in the petition involved professional acts or omissions contemplated by § 25-222.

In *Reinke*, the Nebraska Supreme Court addressed the question of whether the two-year professional negligence statute of limitations applied when a manufacturer of a center-pivot agricultural irrigation system sued the engineer it hired to design the system. 590 N.W.2d at 387-88. Applying the standards in *Wilscam Mullins Birge*, *Wilson*, and *Witherspoon*, the court recognized "that § 25-222 contains the limitations period applicable to an engineer rendering professional services." *Id.* at 388. In analyzing whether the defendant's particular acts were "professional in nature," the court observed that the plaintiff's complaint "and the contract from which [the defendant's] duty to [the plaintiff] arose clearly reflect that the relationship between the parties was entirely based upon an agreement for professional engineering services." *Id.* The court noted, "[a]ll of [the plaintiff's] claims refer to the performance of professional engineering services and specifically state the requirement of engineering

12

expertise and training for the performance of the services." *Id.* Accordingly, the defendant was acting in a professional capacity when rendering services.

Here, E3 admits that when the Purchase Order Contract was signed, E3 understood Biothane to be an engineering company that specialized in anaerobic digestion technology and system integration, including integration of boiler systems and gas systems. Although E3 disputes that Biothane produced any evidence of an engineering license, E3 does not dispute that Biothane, in its capacity as an engineering company, provided engineering services under the Purchase Order Contract. E3 alleges, under its theory of negligent misrepresentation, that its predecessor-in-interest relied on Biothane's representations of its knowledge and expertise regarding supply, start-up and integration of boiler systems into waste management systems and ethanol plants when entering "into the Purchase Order Contract with Biothane to supply, start up and integrate the Boiler System into the Ethanol Plant." (Filing No. 60 ¶ 70.) E3 alleges that the reliance on Biothane's expertise resulted in the Purchase Order Contract to "manufacture, fabricate, install, integrate, program, test, commission and start up the Boiler System."  (*Id.* ¶ 66.)

With respect to PEI, E3 alleges that "[PEI] entered into a subcontract agreement with Biothane pursuant to which [PEI], along with Biothane, was responsible to provide services regarding the manufacture, fabrication, supply, installation, integration, programming, testing, start-up and commissioning of the Boiler System." (Filing No. 60 ¶ 12.) Further, E3 alleges that "Biothane retained responsibility for [PEI]'s work on the Boiler system, as all such work was within the scope of the Purchase Order Contract[.]" (*Id.* ¶ 15.) The subcontract between Biothane and PEI provided that "PEI will design,

13

supply, start-up and warrant the boiler system and controls as well as be responsible for the integrated performance of the compressor, flare and boilers with the digester gas supply so as to optimize the performance of these systems to result in the maximum utilization of the biogas generated by the digesters up to the capacity of the boilers." (*See* Filing No. 383-11 at ECF 2.)

E3 alleges and admits that it expected Biothane and PEI to provide engineering services, and that E3 relied their engineering expertise. The Purchase Order Contract and subcontract included design elements consistent with acts or services "arising out of a vocation, calling, occupation, or employment involving specialized knowledge which is attained from often long and intensive preparation and instruction in skills and methods and the scientific, historical, and scholarly principles underlying such skills and methods." *Reinke*, 590 N.W.2d at 388. Accordingly, the allegations in the Amended Complaint demonstrate that E3 intended the Defendants to perform acts and services in a professional capacity.

The Court concludes that Defendants were acting in a professional capacity when performing the services that gave rise to E3's claims. How E3 chose to label its claims is not determinative. In *Reinke*, the plaintiff alleged various theories of recovery in an attempt "to parse its claims in order to obtain the advantage of longer periods of limitation and avoid the statutory bar of § 25–222." *Reinke*, 590 N.W.2d at 387. The Nebraska Supreme Court said that because the plaintiff's claims were "based on a single professional relationship, however, they may not be separated into various parts to allow different periods of limitation to be applied." *Id.* (citing *Maloley v. Shearson Lehman Hutton, Inc.,* 523 N.W.2d 27 (Neb. 1994)). The court reasoned that the

14

Legislature enacted § 25-222 as a special statute of limitations to govern an entire professional relationship, and did not intend for the various aspects of a professional relationship be parsed or separated for purposes of litigation. *Id.* at 387-88. Accordingly, because E3's claims arose out of its professional relationship with Defendants, "whether pled in tort or contract, the statute of limitations for professional negligence contained in § 25–222 applies." *Id.* at 388 (citing *Witherspoon,* 362 N.W.2d at 41-42).

### C. Accrual

Having determined that Defendants were professionals, and E3's claims arose out of its professional relationship with Defendants, the Court must determine whether E3's claims are time-barred under § 25-222.

"A period of limitations begins to run upon the violation of a legal right, that is, when the aggrieved party has the right to institute and maintain suit." *Reinke*, 590 N.W.2d at 389 (citations omitted). "The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong." *Id.* at 389-90 (citing *Gordon v. Connell,* 545 N.W.2d 722 (Neb. 1996)). "If the facts in a case are undisputed, the issue as to when the professional negligence statute of limitations began to run is a question of law." *Id.* at 390 (citing *Weaver v. Cheung,* 576 N.W.2d 773 (Neb. 1998)).

With respect to professional negligence, the Nebraska Supreme Court has said, "the cause of action accrues and the statute of limitations begins to run at the time of the act or omission which is alleged to be the professional negligence that is the basis for the cause of action." *Tiwald v. Dewey*, 378 N.W.2d 671, 673 (Neb. 1985). "In this

15

regard Nebraska follows the occurrence rule." *Id.* Section 25-222 also provides that "if the cause of action is not discovered and could not be reasonably discovered within such two-year period, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier . . . ."

The key act or omission forming the basis for E3's claims was the bypassing of control processes for the start-up of boiler 602, causing the explosion of February 9, 2007. The most liberal reading of E3's claims is that E3's injuries resulted from Defendants' failure to complete and integrate the Boiler System into the Plant, and not just the explosion. The latest possible date that E3's predecessor-in-interest discovered such claims is November 30, 2007, the date Bio-Mead and its holding company sought bankruptcy protection. The Amended Complaint specifically alleges that they sought bankruptcy protection "as a direct and proximate result" of Defendants' failure to fabricate, install, integrate, program, test, commission, and start up a fully functional Boiler System for the Plant. (Filing No. 60 ¶ 7.) Nothing in the record suggests that any claims continued to accrue after the bankruptcy filing. Because the Amended Complaint and the record demonstrate that Defendants' alleged failures forced Bio-Mead and its holding company to seek bankruptcy protection, the claims accrued, at the latest, on November 30, 2007.

The filing of bankruptcy and assignment of claims did not toll the statute of limitations. The automatic stay applicable in bankruptcy proceedings applies to actions *against* rather than *by* a bankruptcy debtor. *Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles Cnty.*, Inc., 977 F.2d 1224, 1227 (8th Cir. 1992). Nor did the assignment

of claims to E3 revive the statute of limitations. An assignee stands in the shoes of the assignor and as such can obtain no greater rights than the assignor had at the time of the assignment. *Kroeplin Farms Gen. P'ship v. Heartland Crop Ins., Inc.*, 430 F.3d 906, 911 (8th Cir. 2005); *see also Burnison v. Johnston*, 764 N.W.2d 96, 100 (Neb. 2009) (stating "an assignee's rights are no greater than the assignor's"); *In re Boyajian*, 367 B.R. 138, 145 (B.A.P. 9th Cir. 2007) *aff'd*, 564 F.3d 1088 (9th Cir. 2009) (looking to state law to determine assignee's rights in bankruptcy).

E3's claims accrued or were discovered, at the latest, on November 30, 2007. E3 filed its action on February 8, 2011, well outside the limitations period for professional negligence.[2] *See Swassing*, 240 N.W.2d at 28 ("The purpose of [§ 25-222] was to insure that actions based upon professional negligence would be brought shortly after the alleged negligence occurred or was discovered so that the professional could have a fair chance to defend on the merits and not find his defense eroded by the lapse of time.") Accordingly, E3's claims against Defendants are barred by § 25-222, and must be dismissed.

## CONCLUSION

For the reasons discussed above, this Court has jurisdiction over E3's claims. Defendants were "professionals," and each of E3's claims against the Defendants arose from its professional relationship with them. Therefore, the limitations period for filing of the action was set by Neb. Rev. Stat. § 25-222. E3 did not file its claims against

---

[2] All E3's claims, presented as negligence or breach-of-contract theories of recovery, are subject to § 25-222. *Reinke*, 590 N.W.2d at 388 (stating that the various aspects of a professional relationship may not be separated for purposes of the limitations period, and if the claims "are for professional malpractice, whether pled in tort or contract, the statute of limitations for professional negligence contained in § 25–222 applies.")

Defendants within the two-year period allowed by § 25-222, and the claims are untimely. Accordingly,

IT IS ORDERED:

1. The Joint Motion for Summary Judgment (Filing No. 381) filed by Defendants Biothane, LLC and Perennial Energy Co., is granted;

2. Each of the claims asserted by Plaintiff E3 Biofuels, LLC, against Defendants Biothane, LLC and Perennial Energy Co., is dismissed, with prejudice;

3. All other pending motions are denied as moot; and

4. A separate Judgment will be entered.

Dated this 19th day of March, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge